

# In the Missouri Court of Appeals
# Eastern District

## DIVISION ONE

| | | |
|---|---|---|
| J.N., a Minor, by and through his Next Friend, COLLEEN NENTWIG, AND COLLEEN NENTWIG, INDIVIDUALLY, | ) ) ) ) | No. ED113033 |
| Appellants, | ) ) | Appeal from the Circuit Court of St. Louis County |
| AND | ) ) | 22SL-CC01952 |
| RYNE DOBSON, | ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| DR. DALE ANDERSON, | ) ) | Honorable Richard M. Stewart |
| Respondent. | ) | Filed: July 29, 2025 |

Before James M. Dowd, P.J., Angela T. Quigless, J., and Madeline O. Connolly, Sp. J.,

## OPINION

The tragedy giving rise to this case occurred on April 25, 2020 in Webster Groves,

Missouri when Ryne Dobson killed[1] his stepfather Kevin Nentwig (Decedent). Dobson's half-

brother J.N. and his mother Colleen Nentwig sued Dobson's treating psychiatrist Dr. Dale

---

[1] Dobson was charged with first-degree murder and armed criminal action, but the trial court found Dobson not guilty by reason of insanity – specifically, bipolar disorder with psychotic features – pursuant to section 552.030 (RSMo 2016) and committed him to the Missouri Department of Mental Health.

Anderson for wrongful death based on medical negligence. Appellants claimed that Dr. Anderson knew or should have known that Dobson presented a serious danger of future harm to a readily identifiable victim – Decedent – and failed to notify Dobson's family of that danger which failure they claim caused Decedent's death. The jury returned a verdict for Dr. Anderson.

Now in their single point on appeal, Appellants claim that the trial court erred in failing to instruct the jury on an alternative theory of negligence, one that has not been recognized in Missouri. Appellants' Instruction A would have allowed the jury to find Dr. Anderson negligent in prescribing to Dobson a certain anti-depressant medication or in failing to alert Dobson's mother and stepfather to monitor him, and that this negligence caused Decedent's death. Appellants' proposed theory of duty was that healthcare providers owe a duty to third parties to not prescribe medications that affirmatively cause patients to harm third parties.

We are not persuaded to recognize such a duty because the record here does not establish that Decedent's death was reasonably foreseeable. Thus, the trial court did not error in rejecting Appellants' proffered instruction and the court properly submitted Appellants' failure to warn verdict director, Instruction 8, which is the recognized theory of recovery in Missouri under the circumstances of this case.

## Background

In 2019, Dobson began experiencing depression symptoms such as the loss of motivation, insomnia, guilt, indecision, and anxiety. That June, his primary care doctor prescribed Zoloft, an antidepressant. Initially, Dobson attempted to resolve his depression without the medication. Then, after beginning Zoloft in November, Dobson began to suffer hallucinations, severe insomnia, and severe appetite loss which led to his hospitalization. Dobson was then prescribed olanzapine, an antipsychotic and mood stabilizer medication used to stop hallucinations and

2

delusions that can also be used to treat bipolar disorder. The olanzapine stopped the hallucinations and helped Dobson sleep better. Throughout his mental health struggles, Dobson was a regular marijuana smoker. Specifically, he ingested "dabs" or "wax" which are highly concentrated forms of THC[2] with strong potencies.

In late January 2020, Dobson began seeing Dr. Anderson for mental health treatment. Dr. Anderson diagnosed him with major depressive disorder, panic disorder, generalized anxiety disorder, and attention-deficit/hyperactivity disorder (ADHD). He did not believe Dobson had bipolar disorder.[3] Based on his diagnoses, Dr. Anderson prescribed 12.5 milligrams of Paxil, a psychotropic anti-depressant medication, Adderall for Dobson's ADHD, and hydroxyzine to help soothe his anxiety. He also referred Dobson to a clinical psychologist for cognitive therapy. Finally, he told Dobson to stop using marijuana because it was still illegal and could interfere with his medications.

From February to March, Dobson's depression improved. So, in February, Dr. Anderson increased the Paxil dosage to 37.5 milligrams and instructed Dobson to stop taking the olanzapine. By April 1, Dobson experienced severe insomnia. Dr. Anderson recommended that Dobson increase the hydroxyzine up to 100 milligrams if needed. Several days later, they spoke on the phone and Dobson reported that he had exceeded the dosage by 25 milligrams and still

---

[2] Tetrahydrocannabinol (THC) is the main psychoactive ingredient in marijuana. Department of Justice/Drug Enforcement Administration (April 2020), https://www.dea.gov/sites/default/files/2020-06/Marijuana-Cannabis-2020_0.pdf. THC "has intoxicating effects, meaning it can temporarily alter a person's mood, thoughts, and perceptions." National Institute on Drug Abuse, Cannabis (Marijuana) (September 2024) https://nida.nih.gov/research-topics/cannabis-marijuana#what-is-cannabis.

[3] After his arrest, the psychiatrist treating Dobson while he was in the St. Louis County jail diagnosed him with "bipolar disorder, manic."

could not sleep. Dr. Anderson told Dobson to discontinue the hydroxyzine and to start taking Lunesta for the insomnia.

On April 20, during their final office visit together before Dobson killed his stepfather, Dr. Anderson observed Dobson to be very depressed. Dobson told Dr. Anderson that he believed that his "father" had molested him as a child.[4] Although Dobson told Dr. Anderson he was having suicidal thoughts, the doctor did not believe that Dobson intended to act on those thoughts, and he did not observe any other symptoms such as confusion, psychosis, aggressiveness, agitation, elevated mood, hyperactivity, or impaired judgment. Dr. Anderson upped the Paxil dosage to 50 milligrams, prescribed a different anti-anxiety medication, and prescribed trazodone to help Dobson sleep since the Lunesta was not working. Five days later, Dobson, in a purported manic state, stabbed Decedent to death. Dobson later stated he believed Decedent had raped him.

In March 2022, Appellants[5] filed this wrongful death suit based on medical negligence against Dr. Anderson. The case proceeded to trial in July 2024. During the instruction conference, the court agreed to submit Appellants' verdict director, which the court later numbered Instruction 8. That instruction submitted a failure to warn theory which provided that the verdict must be for the plaintiffs if the jury believed that Dr. Anderson knew or should have known that Dobson presented a serious danger of future harm to Decedent, a readily identifiable victim, and that he failed to notify Appellants of the danger. The court then rejected Appellants' proposed Instruction A, another verdict director which allowed the jury to find in favor of

---

[4] During the time he was on Zoloft, Dobson had previously claimed that either his stepfather or his biological father had molested or raped him and during their first visit, Dobson told Dr. Anderson that he believed his biological father, not the victim here, had molested him.

[5] Dobson was also a plaintiff in the underlying lawsuit, but he is not a party to this appeal.

Appellants if it believed that by either prescribing an SSRI antidepressant medication to Dobson or by failing to advise Appellants and Decedent to monitor Dobson, that Dr. Anderson was negligent which directly caused or contributed to cause Decedent's death. The jury returned a verdict for Dr. Anderson on Instruction 8 and this appeal follows.

## Standard of Review

"Whether a jury was instructed properly is a question of law that this Court reviews *de novo*." *Templemire v. W & M Welding, Inc.*, 433 S.W.3d 371, 376 (Mo. banc 2014). Similarly, "[t]he trial court's refusal to give a party's proffered instruction is reviewed *de novo*, evaluating whether the instructions were supported by the evidence and the law." *Miller v. Norfolk Southern Railway Company*, 591 S.W.3d 29, 38 (Mo. App. W.D. 2019). "This Court views the evidence in the light most favorable to submission of the instruction." *Stevens v. Markirk Constr., Inc.*, 454 S.W.3d 875, 880 (Mo. banc 2015). Thus, we disregard contrary evidence. *Douglas v. St. Louis Cold Drawn, Inc.*, 439 S.W.3d 775, 779 (Mo. App. 2014).

"An instruction must be given when there is substantial evidence to support the issue submitted." *Meyer ex rel. Meyer v. Astrazeneca Pharmaceuticals, L.P.*, 224 S.W.3d 106, 108 (Mo. App. E.D. 2007). A party is entitled to submit an instruction upon any theory supported by the evidence. *Bach v. Winfield-Foley Fire Prot. Dist.*, 257 S.W.3d 605, 608 (Mo. banc 2008); *but see Blanks v. Fluor Corp.*, 450 S.W.3d 308, 393 (Mo. App. E.D. 2014) (where this Court rejected a legal theory and therefore did not address the party's allegation of error regarding the trial court's rejecting of an instruction that sought to submit that theory).

## Discussion

Appellants claim that the trial court erred in failing to instruct the jury on their theory, which is a matter of first impression in Missouri, that Dr. Anderson had a duty to third parties

5

like Appellants to not prescribe medications that cause or contribute to cause their patients to harm third parties. We disagree and find under the public policy factors used to determine whether a new duty should be recognized in Missouri, as outlined by our Supreme Court in *Hoover's Dairy, Inc. v. Mid-America Dairymen, Inc.*, 700 S.W.2d 426 (Mo. banc 1985), and under the specific facts of this case, that Dr. Anderson did not have a duty to Decedent because Dobson's violent conduct was not reasonably foreseeable.

Preservation. It appears that Appellants have preserved this point. During the instruction conference, Appellants proposed Instruction A as an additional verdict director along with Instruction 8, their failure to warn verdict director. The court had already rejected Instruction A in an off-the-record discussion. Then back on the record, Appellants told the court that in lieu of spreading their arguments upon the transcript, they would simply adopt the written arguments they had made months earlier in their summary judgment response addressing the same issue, i.e., the legal viability of their theory that physicians have a duty to not prescribe medicine that may cause the patient to harm third parties. In their motion for new trial, Appellants asserted the same issue and included their same written arguments.

We do not sanction Appellants' resort to and incorporation of a previous written argument instead of stating their arguments on the record during an instruction conference as required by Rules 70.02(e)[6] and 70.03. But, under the circumstances of this case, we conclude that Appellants preserved the issue by a hair. *See Rhoden v. Missouri Delta Medical Center*, 621 S.W.3d 469, 480 (Mo. banc 2021) (where the Court found that MDMC's point was preserved even though counsel made only a vague objection during the instructions conference and did not make a more specific objection until its new trial motion because the trial court was "fully

---

[6] All rule references are to the Missouri Supreme Court Rules (2024) unless otherwise stated.

apprised of MDMC's argument …."). Nevertheless, we discourage litigants from adopting this approach to preserving instructional error and we do not endorse it.

"In any action for negligence, a plaintiff must establish the defendant owed a duty of care to the plaintiff, the defendant breached that duty, and the defendant's breach proximately caused the plaintiff's injury." *Wieland v. Owner-Operator Servs., Inc.*, 540 S.W.3d 845, 848 (Mo. banc 2018) (internal quotations omitted). "The touchstone for the creation of a duty is foreseeability." *Id.* "Whether a duty exists is purely a question of law." *Hoffman v. Union Elec. Co.*, 176 S.W.3d 706, 708 (Mo. banc 2005) (internal citation omitted).

"A duty of care arises out of circumstances in which there is a foreseeable likelihood that particular acts or omissions will cause harm or injury." *Bradley v. Ray*, 904 S.W.2d 302, 311 (Mo. App. 1995) (internal quotations omitted). "In such cases, the duty does not arise out of 'any special relationship' between the parties, but rather arises 'out of the defendant's knowledge of a dangerous condition, which imperils the plaintiff, as well as time and ability to prevent the attack.'" *Id.* (quoting *Reed v. Hercules Constr. Co.*, 693 S.W.2d 280, 282 (Mo. App. 1985).

"The judicial determination of the existence of a duty rests on sound public policy as derived from a calculus of factors: among them, the social consensus that the interest is worthy of protection; the foreseeability of harm and the degree of certainty that the protected person suffered injury; moral blame society attaches to the conduct; the prevention of future harm; consideration of cost and ability to spread the risk of loss; the economic burden upon the actor and the community …." *Hoover's Dairy, Inc.*, 700 S.W.2d at 432.

Thus, in determining whether public policy supports the recognition of a duty in this case, we are guided by the *Hoover's Dairy* factors, particularly the foreseeability of the harm to Decedent here. "[F]oreseeability that some injury might result from the act complained of

normally serves as the paramount factor in determining the existence of a duty." *Id.* at 431. "Foreseeability, for purposes of determining if a duty exists, is defined as the presence of some probability or likelihood of harm sufficiently serious that ordinary persons would take precautions to avoid it. A mere possibility of harm is insufficient." *Reddick v. Spring Lake Estates Homeowner's Association*, 648 S.W.3d 765, 781 (Mo. App. E.D. 2022) (internal citations omitted).

Here, the tragedy that unfolded on April 25 was not reasonably foreseeable. First, the record does not establish that Dobson intended to harm anyone. Rather, the record before this jury evinced a psychiatrist treating a troubled young man. When Dr. Anderson learned that Zoloft may have caused Dobson to suffer hallucinations, he prescribed him Paxil which absorbs more slowly and tends to minimize the risk of side effects. And when Dr. Anderson met with Dobson between January and April, Dobson did not show any signs of bipolar disorder – only depression, anxiety, and ADHD. Also, Dr. Anderson did not know that Dobson had a family history of bipolar disorder and schizophrenia. Hindsight may be 20/20, but this record does not support that Dr. Anderson should have anticipated Dobson's conduct that night.

The remaining *Hoover's Dairy* factors. The health and safety of a foreseeable victim, such as an immediate family member the patient makes explicit threats about, is certainly an interest worthy of protection. But that must be balanced with the public's interest in maintaining the physician-patient privilege. *Virgin v. Hopewell Center*, 66 S.W.3d 21, 27 (Mo. App. E.D. 2001). And again, Appellants have failed to demonstrate on this record that Decedent here was a "foreseeable" victim.

It is manifest that diagnosing and treating mental illness is among the most delicate and nuanced tasks which is plagued with uncertainties. Adopting Appellants' proposed duty under

the facts of this case could unnecessarily shackle a psychiatrist with deterrent caution to prescribe medication, such as antidepressants, to help individuals with mental health struggles who show no signs of violence on the undocumented chance that they may become violent. With these principles in mind, we find no duty under these circumstances.

For their part, Appellants cite to several cases from other states in support of their urging that we recognize this new duty to third persons. *B.R. ex rel. Jeffs v. West*, 275 P.3d 228, 233-34 (Utah 2012) (healthcare providers owe a duty of care to third parties not to prescribe medications that affirmatively cause patients to harm third parties); *Mower v. Baird*, 422 P.3d 837, 841 (Utah 2018) (a treating therapist of a minor child owes a duty to a nonpatient parent to refrain from creating false memories of sexual abuse by that parent); *Cheeks v. Dorsey*, 846 So.2d 1169, 1173 (Fla. Dist. Ct. App. 2003) ("When one administers a drug which, when combined with other drugs or alcohol, may severely impair the patient, the doctor's failure to take proper precautions (i.e., verify whether the patient is already under the influence of another drug) is an affirmative act which creates the risk that unidentifiable third parties might be injured"); *Taylor v. Smith*, 892 So.2d 887, 895 (Al. 2004) (same holding as *Cheeks*).

We are unpersuaded in light of our *Hoover's Dairy* analysis. Moreover, *Mower*, *Cheeks*, and *Taylor* are readily distinguishable because the injuries there were found to be foreseeable under the circumstances of those cases.

### Conclusion

We affirm for the foregoing reasons.

_____
James M. Dowd, Presiding Judge

Angela T. Quigless, J., and
Madeline O. Connolly, Sp. J., concur.

9